### 1867.   McDONALD v. THE STATE.

1. Under the law as it existed prior to September 19, 1908, the county authorities of the respective counties of this State had the legal right to employ the misdemeanor chain-gangs in private works, but not to give the control of the convicts therein to private individuals. Prior to that date it was legal for the ordinary, having charge of county matters, to organize a chain-gang, employ guards and other officers to manage it, and to contract with a private firm of persons that the chain-gang should do labor in their private business, provided that the actual control of the prisoners was wholly in the county authorities and was neither directly nor indirectly given to any private person.

2. The duly appointed whipping-boss of a chain-gang so organized and employed could justify the whipping of one of the convicts, if it appeared that the latter had been guilty of insubordination or an attempt to assault a guard, provided the whipping was not brutal or in excess of what was reasonable under all the circumstances.

Indictment for assault and battery, from Turner superior court —Judge Park. April 13, 1909.

Argued May 18,—Decided June 15, 1909.

McDonald was convicted of assault and battery upon one Dave Cook, whom the testimony shows he had whipped. He attempted to justify the battery by showing that he was the whipping-boss of the Turner county chain-gang, in which Cook was a misdemeanor convict, and that the latter had been guilty of refusing to work and of acts of insubordination by attempting to take a gun from one of the guards. The place where the whipping occurred was spoken of in the evidence as being the chain-gang of Conolly & Pinson. To show that it was a legally organized chain-gang, and that he was the regular whipping-boss, the defendant offered the following documents, which were excluded by the court as being irrelevant:

"Georgia, Turner County. This contract, made and entered into this the———day of January, 1908, by and between Turner County, Georgia, which contracts by and through W. A. Greer, ordinary thereof, party of the first part, and Conolly & Pinson, a partnership, composed of H. W. Conolly and T. J. Pinson, of Worth County, party of the second part, witnesseth that the said party of the first part, for the consideration hereinafter named, hereby contracts to establish a chain-gang upon the turpentine works of the said party of the second part on land lot No. 246 in the 16th district of said county, for the purpose of working the misdemeanor convicts of said county and such other counties as do not work their own convicts, and to employ the said convicts assigned to and confined in the chain-gang heretofore established as above stated, to be employed on the works of the said party of the second part, located in the said county, for and during the term beginning on February 1, 1908, and ending on such day as the said ordinary may designate between the date of February 1, 1908, and January 1, 1909, and the said party of the second part to be given fifteen days notice from the day thus fixed for this contract to expire. The said chain-gang is to be established, maintained, and operated, and the said convicts to be worked in the manner provided by law, and in accordance with the rules and regulations of the prison commission of the said State, the ordinary of said county, and those having legal authority over the same, the same

being at all times subject to any endorsements or changes that may be made in the law and rules and regulations governing the same by proper authorities. This contract shall apply to all convicts sentenced by the courts of said county as may be turned over to the parties of the second part by the party of the first part, and to such as may be hired by the said ordinary or his successors in office and assigned to the chain-gang. It is further agreed that the said Conolly & Pinson shall have the right to hire any misdemeanor convicts from any county of this State, or from any person, firm, or corporation who may have previously leased or hired said convicts, and maintain said convicts in camp No. 3 established upon the works of said Conolly & Pinson in land lot No. 246, upon the approval of the ordinary. It is expressly understood and provided hereby that no person directly or indirectly interested in the works of the said party of the second part shall exercise any authority or control over them in any way. This chain-gang to be established under and be at all times subject to any order passed by said ordinary on the first day of January, 1906, with reference to the establishment and operation of chain-gangs, which order is of file and record in the office of said ordinary.

"Now, therefore, pursuant to and in consideration of the foregoing terms and conditions, all of which are hereby agreed to, the party of the second part obligates and binds itself as follows, to wit: The party of the second part leases to the said party of the first part the convict premises located upon their turpentine works upon land lot No. 246 in said county, together with the bedding, cooking utensils, guns for guards, and all other equipments and supplies, and hereby delivers over the same to the management and control of the said party of the first part, and the proper authorities under law for the term of this contract, and further obligates to keep up and maintain said camp and keep it supplied with all necessary and proper equipment for and during the term of this contract, and, in addition to all this, to pay to the said party of the first part for the labor of said convicts the following net sum per month, to wit: Such price as may be agreed upon from time to time, the word 'month' as above used to mean 26 working days, and the amount to be due and payable on the first day of each month. The said party of the second part further contracts to furnish, upon the order of

said ordinary, all regulation clothing and rations and have the cooking done for said convicts, all in accordance with the rules and regulations of the prison commission of this State, this being subject to any change or changes that may be made from time to time in the regulations now of force, for ten and no/100 dollars per month, the word month here used to mean calendar month, this to be due and payable from the party of the first part to the party of the second part on the same day of each month that the net hire of said convicts becomes due and payable from the said party of the second part to the said party of the first part as above designated, statement to be made up and filed with said ordinary after being certified and corrected by the superintendent of the chain-gang, showing credits and debits accordingly. The said party of the second part hereby agrees and binds itself to give a good and sufficient bond, if required by said ordinary at any time, conditioned for the prompt and faithful discharge herein and hereby contracted on its part, the amount of said bond to be fixed by and the same to be approved by said ordinary.

"In witness whereof both the said parties have hereunto affixed their hands and seals the day and year first above written." (Signed and sealed by the parties.)

"Georgia, Turner County. This contract, made and entered into this the first day of May, 1908, by and between T. A. McDonald of said county and State, party of the first part, and Turner County, Georgia, which contracts by and through W. A. Greer, ordinary for said county, party of the second part, witnesseth that the party of the first part hereby contracts to perform well and faithfully all of the duties of superintendent and whipping-boss of chain-gang No. 3, located on lot of land number 246 in the 16th district of originally Worth county, now Turner county, Georgia, for and during the term of said appointment to said position, for the sum of $40 per month, which the said party of the second part hereby agrees to pay, the same to be due and payable on the first day of each month and the month to be a calendar month. This contract is to be operative and to be of force from the first day of May, 1908, until the first day of January, 1909, unless sooner terminated as follows: the ordinary reserving the right to revoke the appointment of the said party of the second part for sufficient cause in his discretion; and

the said party of the first part shall have the right to resign said position upon fifteen days notice to the party of the second part, if he should so desire." (Signed and sealed by the parties.)

The court charged the jury as follows: "All convict camps in Georgia at this time, or in ten years prior to this time, were illegal, where the work done by convicts was done for private parties, or working turpentine or at lumber mills, etc., the convict being required to work on the public works of the State and not in private camps." To this exception is taken.

*John B. Hutcheson, Claude Payton,* for plaintiff in error.

*W. E. Wooten, solicitor-general,* contra.

POWELL, J. (After stating the foregoing facts.)

It will be seen by reference to the action of the court in excluding from evidence the contract between Turner county and Conolly & Pinson, and also the order of the ordinary of the county appointing the defendant whipping-boss of the convict camp, and in instructing the jury in the manner set out above, that the judge took the view that all misdemeanor convicts in this State in 1908 and prior thereto could not be employed otherwise than upon public works; that to employ them otherwise would be so wrongful that the officials of the county chain-gang who attempted to carry out the direction of the ordinary (or other tribunal having county matters in charge) could not justify their acts in enforcing discipline. We think that the judge erred in his view of the law. By the Penal Code, §1039, persons convicted of a misdemeanor are punishable "by a fine not to exceed one thousand dollars, imprisonment not to exceed six months, to work in the chain-gang on the public works, or on *such other works* as the county authorities may employ the chain-gang, not to exceed twelve months, and any one or more of these punishments may be ordered in the discretion of the judge." In this same section there is a proviso as follows: "That nothing herein contained shall authorize the giving the control of convicts to private persons, or their employment by the county authorities in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor." By the Penal Code, §§1146-1149, the county authorities are authorized to appoint a whipping-boss for misdemeanor convicts, to fix his compensation, and to define his duties. This officer is authorized to administer punishment

upon the convicts in cases where it is reasonably necessary to enforce discipline and to compel work and labor; and the county authorities are empowered to adopt rules governing these things. By the Penal Code, §1149, no personal liability attaches to the whipping-boss for any injury or damage done to a convict, if he acts in accordance with the rules thus adopted. This section seems to be broad enough in its terms to include an exemption from both civil and criminal responsibility.

By looking to the contract between the ordinary of Turner county and Conolly & Pinson it will be seen that the proper authority in that county had organized a chain-gang; that the convicts were not to be given into the control of private persons; that the chain-gang was to be managed exclusively by the county authorities, through regularly appointed guards and officers under the supervision, rules, and regulations of the prison commission; but that the convicts were to be worked, not on public works, but upon what may be called private works, that is to say, upon the turpentine farm of Conolly & Pinson. The ordinary did not hire or lease the convicts to that firm, but did contract that the labor of the convicts should be employed for their use and benefit. This presents the question squarely whether, prior to September 19, 1908, it was lawful for the county authorities to employ the county chain-gangs in doing work for private persons, where the control of the prisoners was fully retained by the county authorities, and where no private person directly or indirectly had any authority over the convicts themselves.

The statute (Penal Code, §1039) provides that the misdemeanor convicts shall be sentenced to work "on the public works, *or on such other works* as the county authorities may employ the chain-gang;" and the Supreme Court has held that the trial court should follow this formula in sentencing prisoners to the chain-gang. *Screen* v. *State,* 107 *Ga.* 715 (33 S. E. 393). Since works are usually either public or private, it would seem that there is but little need to resort to construction to determine the meaning of the statute. A person looking merely to the language of the code section itself would easily and naturally reach the conclusion that the legislative intent was that convicts should be put to labor on the public works unless the county authorities should see fit to employ them in other work; and as works other than

public are usually private, he would naturally draw the inference that the county authorities might employ them on private works. This, we say, is the plain, normal, ordinary meaning which the words would convey. But sometimes words get a strained or un-, natural meaning from the context, or from the history of the legislation. The word "other" is a term that frequently tends to limit that which otherwise would have a broader meaning. Its use here might therefore justify a court in saying that the words "other works," from the context, mean other like works, and include only quasi public works. We shall therefore look into the history of the legislation on the subject, to see if any such construction is proper in the particular instance.

The rule is well recognized, of course, that the history of a statute may give to its words a meaning they otherwise might not have, and, on the other hand, that it may emphasize the fact that the words are to retain their common and ordinary sense. See *Acree* v. *State*, 122 *Ga.* 144 (50 S. E. 180). We shall first look to see whether these words "on such other works," etc., were in the statute originally or were added by amendment. Going back to the Code of 1873, we find section 4310 (corresponding to section 1039 of the Penal Code of 1895) providing, as to this subject, only for work in a chain-gang on the "public works." By cognate sections of the Code of 1873 (§§4814, 4815, 4820) the ordinaries of the counties of the State were given authority to organize chain-gangs, and to cause the prisoners to be put to work on the public roads, or to turn over the county convicts to the Governor, to be employed on the Western & Atlantic Railroad, or to hire them out to private individuals and other contractors engaged in doing public work. Under this plan, while the convicts were to be employed only in public works, their physical custody and control might be delivered into the hands of private persons, engaged in that form of work. In 1874 two acts were passed. One of them, approved February 28, 1874 (Acts 1874, p. 24), amended section 4814 of the Code of 1873, and authorized the ordinary or other county authorities to work the convicts on the public works of the county in chain-gangs or otherwise, "or to hire out such convicts, upon such terms and restrictions as may subserve the ends of justice." This act, after having been subjected to certain mutations, now appears in the Penal Code of 1895,

§1137. See *Binns* v. *Ficklen,* 130 *Ga.* 379 (60 S. E. 1051). Since, however, the trial judge, whose power to punish was fixed by §4310 of the Code of 1873, could sentence the defendant only to public works, it is doubtful whether the county authorities could have hired the convicts out to any private individual who was not engaged in doing some form of public work. This question was presented to the Supreme Court in a slightly different form at a little later date, as we shall soon see. However, this attempt to change the law, though it may have been futile for technical reasons, shows the trend of the legislative mind toward the allowing of misdemeanor convicts to be put to private labor in such cases as the county authorities deemed best. In the same year an act (Acts 1874, p. 29) was passed allowing any misdemeanor convict, with the approval of the trial judge, to hire himself to a private individual to do private labor, and the status of the convict under these circumstances was defined. The system which required the counties to employ the misdemeanor convicts on the public works had evidently become unsatisfactory or burdensome. In 1875 a local law was passed providing that where persons were convicted and sentenced by any court in Quitman county to work on the public roads or public works, "the board of county commissioners of said county may and are hereby authorized to hire out such convicts within the limits of the State upon such terms and under such restrictions as may, in the opinion of such commissioners, best subserve the ends of justice and promote the interests of the county." In 1877 Oliver Moore was convicted in the county court of Quitman county, and sentenced to work in the chain-gang. The county commissioners hired him to one Ogletree to work on the latter's farm. Ogletree demanded the prisoner of the sheriff, and, upon the latter's refusal to deliver, brought habeas corpus. The case came in due time to the Supreme Court, and was decided at the August term 1877. See *Ogletree* v. *Dozier,* 59 *Ga.* 800. The Supreme Court, after quoting the local act of 1875, said: "It will be observed that this act does not provide that the court shall sentence the prisoner to be hired out on a private plantation in certain contingencies, but it empowers the commissioners to hire him out after the sentence of the court—in other words, to hire him out for private work instead of working in the chain-gang, or being

confined in jail, or paying a fine as he was sentenced. It there-
fore empowers the commissioners to change or commute the sen-
tence of the court. But the constitution declares that the Gover-
nor shall have power to commute penalties—Code, section 5075.
To commute means to change; and as the constitution vests
this power in the executive, the legislature, we think, can not
take it away and give it to county commissioners." It will be
remembered that at this time the judge's power to sen-
tence for misdemeanors was limited "to work in the chain-gang
on the public works." There must have been at that time some
considerable sentiment against putting prisoners to what was evi-
dently regarded as especially hard 'and degrading punishment,
namely, to labor in the chain-gang on the public works, for the
court in the course of the opinion says: "In a legal sense, to
commute would mean to change from a higher to a lower punish-
ment—to change a penalty from the hard work of a chain-gang
to work on a farm, for instance; and we hold that this power be-
longs, if it be exercised at all, to the governor." At the close of
the opinion, Judge Jackson, who wrote it, threw out this sugges-
tion: "We do not mean to say that the legislature could not em-
power the courts to punish and sentence to work on a farm, or to
any work or penalty not prohibited by the constitution." At the
next session of the legislature this suggestion was acted upon.
The manifest legislative intent that misdemeanor convicts might
be placed at private labor instead of public work having been
thwarted, because in its previous enactments the General Assem-
bly had sought to confer the power so to work them upon the
county authorities, irrespective of the language of the sentence of
the court, and had not, as it should have done, changed the nature
of the sentence to be imposed, that body in 1879 undertook an
amendment of section 4310 of the Code of 1873, which related
to the form of sentences. It will be found by reference to the
legislative journals that the bill 'for that purpose originated in
the House of Representatives, and, as it passed that body, merely
added to the language already found in the code sections the
words, "or such other works as the county authorities may em-
ploy the chain-gang;" and that when it reached the Senate that
body further amended by inserting the word "on" before the
word "such" in the quotation just given (probably to make it

clearer that this was a distinct provision, and that neither the word "such" nor the word "other" was to be limited in meaning by reason of close association with the language of the previous clause), and also by adding the proviso "that nothing herein contained shall authorize the giving the control of convicts to private persons, or their employment by the county authorities in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor." And in this shape the act was passed (Acts 1878-9, p. 54). We can not escape the obvious conclusion that this legislation, thus circumstanced, originated, limited, and enacted, evinced a clear legislative intent that the county authorities might employ the convicts in the doing of private work, provided that the custody of prisoners—their management and control—was not put into private hands, but was kept under the regular appointed officers, guards, bosses, etc., which by other sections of the code the county authorities were authorized to appoint. If this had not been the intention of the General Assembly, it would not likely have gone to the trouble of passing the act in the form it did. If the legislature by using the words "other works" had intended merely quasi public works, the amendment would have been wholly unnecessary, would have been merely a piece of supererogation; for there had been no tendency to construe the words "public works" strictly, but on the contrary the Supreme Court had construed them broadly and liberally. See *Lark* v. *State,* 55 *Ga.* 436 (decided in 1875). Section 4310 of the Code of 1873, as amended by the act of 1879, retains its form in section 1039 of the Penal Code of 1895, subject to the act of September 19, 1908 (Acts 1908, p. 1119).

If it had not been for the proviso created by the Senate amendment to the act of 1879, the county authorities, under other code sections and statutes then in existence (see Code of 1882, §§ 4814, 4815, 4820, 4821 (e)), might not only have employed the convicts upon private works but also have turned over the physical custody of the prisoners to private hirers. The effect of this proviso was to repeal so much of those laws as authorized the hiring out of the convicts and the delivery of their custody and control to private persons. *County of Walton* v. *Franklin,* 95 *Ga.* 538 (22 S. E. 279).

The legal effect of the changes made in the law by the act of 1879 was to require the judges, in imposing chain-gang sentences, to direct that the prisoners be employed either on public works or on such other works as the county authorities might direct (*Screen* v. *State,* supra), and to authorize the county authorities so to work them. The ordinaries and other authorities having in charge county matters were required by law to organize the chain-gangs and to direct where they should be put to labor upon either public roads, city streets, or private works.

There is nothing to which we are unaccustomed in the retention of the control of convicts by the public authorities while their labor is sold to private persons. This plan was pursued as to the felony convicts from 1897 to April 1, 1909. *Mason* v. *Hamby,* ante, 131 (64 S. E. 569). See Acts 1897, p. 71; Acts 1903, p. 65. Under these acts the prison commission organized the penitentiary system, and employed wardens, guards, etc., who had the immediate control of the prisoners, but leased the labor of the felony convicts to private lessees. Under the acts of 1897 and 1903, cited above, the prison commission was given general supervisory powers over the misdemeanor chain-gangs, but the particular control was left with the county authorities and the officers by them employed.

In no case (if we except the palpable obiter in the case of *Rountree* v. *Durden,* 95 *Ga.* 221, 22 S. E. 149), has the Supreme Court ever held that a bona fide arrangement by which the county authorities organized the chain-gang, employed the proper officers, and through them retained actual control of the men but employed their labor for private individuals, was illegal. Such work in a very fair sense is indeed quasi public work, for the county receives the benefit of the labor, as the amounts realized from the contracts to do the labor for individuals is paid into the county treasury and is used for public purposes. In all of the opinions rendered by the Supreme Court on the subject there is a negative pregnant that such an arrangement would be legal. In *Russell* v. *Tatum,* 104 *Ga.* 332 (30 S. E. 812), it is said: "That convicts can not be worked in chain-gangs *controlled by* private individuals is well-settled law of this State." Also, in the same case: "The detention of the convict by the private individual *who had him in custody* was therefore illegal." In that case the

county judge had hired the convict to Tatum, and Tatum had organized ,and was controlling the chain-gang. In *Simmons* v. *Ga. Iron & Coal Co.,* 117 *Ga.* 306 (43 S. E. 780, 61 L. R. A. 739), the Supreme Court said: "Convicts can not be worked in *private chain-gangs controlled by private individuals."* In the course of the opinion it is stated: "The right to have the prisoner discharged is based on the further ground that he is held in custody, under a sentence of the superior court, in a private chain-gang under the control and management of private individuals, acting for a private corporation." In *Daniel* v. *State,* 114 *Ga.* 537 (40 S. E. 806), it was said, "It appears from the evidence that the accused, after his conviction of the offense of larceny in the city court of Jefferson, was hired by the county authorities of Jackson county to the board of commissioners of roads and revenues of Elbert county, and that the Elbert county authorities in turn hired him, with other misdemeanor convicts, to Swift Brothers, a firm doing business in Elbert county. Swift Brothers were private parties. They made a bond, with sureties, 'to hold the County of Elbert blameless and free from damage and cost and expense for the management, control, and detention' of the convicts hired to them. The officers of the camp, while appointed by the county, were paid by Swift Brothers. The convicts were worked on a farm. Beyond the appointment of guards and bosses, who, as before stated, were paid by Swift Brothers, *the county authorities had no control whatever over the convicts.* All this is uncontroverted. We are constrained to hold that under the law of this State the accused was not, at the time of his escape, in a lawful place of confinement, and can not be punished for escaping therefrom, under the provisions of Penal Code, § 314. The law regulating the punishment of misdemeanor convicts (Penal Code, § 1039) expressly provides 'that nothing herein contained shall authorize the giving the control of convicts to private persons, or their employment by the county authorities in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor.' *It would be absurd to hold that the mere appointment by the county of guards, without more, is such an assertion of control, management, and authority by it as to save the hiring of its misdemeanor convicts to private persons from repugnance to the proviso quoted."* The italics in the fore-

going quotations are ours, and are used to emphasize the fact that in each case the decision of the court was directed to the fact that the convicts were given into private control, and that there is not the slightest intimation that the confinement was illegal because the work was private work. If the employment of convicts on private work were of itself illegal, it would be remarkable indeed that the Supreme Court should not have given some intimation of that fact in some of the cases cited, instead of placing the decisions solely and alone upon the question of whether the control was individual or official. For instance, in the *Daniel* case, if the court had held the view that the employment of the chain-gang in the doing of private work was illegal, a ruling to that effect would have prevented the necessity of going into the more complex question as to whether, under the particular arrangement appearing in that case, the control of the convicts was delivered to private persons, or was retained by the county authorities.

The General Assembly seems to have recognized that the language of section 1039 of the Penal Code allowed the county authorities to employ the convicts in private works; for at the special session of 1908, after a lengthy report had been received from a special investigating committee, inveighing against the employment of convicts otherwise than upon public works, an act was adopted striking the words "or on such other works," etc., from that section and leaving it so that the sentence of the court should read in future "to work in the chain-gang on the public roads, or on such other public works as the county or State authorities may employ the chain-gang." Acts 1908, p. 1119.

One other point deserves attention. One of the provisos in section 1039 of the Penal Code is that the convicts shall not be employed by the county authorities "in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor." The contract between the ordinary of Turner county and Conolly & Pinson provided that the chain-gang should work in the turpentine business of that firm. The court charged the jury that convicts could not be employed in the turpentine business. We hardly think that work on a turpentine farm is a mechanical pursuit, according to the definitions which have been given that phrase. See the definitions of this phrase.

collected in 5 Words & Phrases, 4462. However, be this as it · may, the employment of the chain-gang in all mechanical pursuits was not forbidden. It might be so employed if the products of the convicts' labor were not brought into competition with the products of free labor. This was a question for the determination of the county authorities, under the supervision of the prison commission; and their decision in the matter was not subject to be brought into question by the whipping-boss, or other official employed to conduct the chain-gang under the direction of the county authorities; nor is their decision subject to collateral attack in this proceeding. This much of the statute is necessarily largely directory. A similar provision was inserted in the act authorizing the prison commission to let out the felony convicts, prior to the present year; and it is a matter of current history and general information that they employed a large number of the men on turpentine farms, presumably because they would be brought less into competition with free labor there than in other ordinary employments. This proviso was inserted into the law for the benefit of free laborers, not for the benefit of the convicts. Neither the prisoners nor the guards or whipping-bosses were legally interested in the question as to whether the products of the work done by the chain-gang came into competition with the products of free labor or not. The question of the legality of the particular employment would be before the court if some free laborer (or perhaps some officer authorized to act on behalf of the State itself) had made the complaint. *Mayor* v. *Simmons*, 96 *Ga.* 480 (23 S. E. 508); *Reid* v. *Eatonton*, 80 *Ga.* 755 (6 S. E. 602); *Fincher* v. *Collum*, 2 *Ga. App.* 743 (59 S. E. 22).

2. It follows from what we have said above that the court erred in excluding the documents tendered by the defendant, and in giving the instruction complained of. Exception is also taken to the action of the court in admitting, over objection, certain testimony tending to show the convict's bad physical condition at the time of the whipping. This was clearly admissible. While the "boss" might have had the right to whip the convict, he had no immunity from any liability for brutality arising from his going beyond what was reasonable under the circumstances. It does not clearly appear that the defendant was guilty of doing more than the circumstances and his authority in the premises

authorized. This question should be submitted to the jury under proper instructions; and all testimony fairly tending to illustrate this question will be relevant.

If the eyes of one, a citizen of another State, or yet of a future generation, should chance to fall upon these pages, he will perhaps wonder why questions of such apparent juristic simplicity should have engaged the pains of the court to such a length. However, we have deemed it necessary to go into the question lengthily and with much painstaking. Indeed we may state, in fairness to the trial judge, that the view of the law presented in the rulings complained of is in accord with that current largely among the bench and bar of the State. A cognate phase of this great question, its legislative aspect, held the General Assembly of this State in extraordinary session for many days last year. Outcry, resolutions, investigation, and even the able report of the investigating committee (see Acts 1908, pp. 1059 et seq.) have tended to raise the question to such importance as to make the research we have given it worth the while. The old system is gone; a new system is in vogue. Any word as to the wisdom of either is not within our province to say. The case arose under the old law, and is to be administered accordingly.                    *Judgment reversed.*